IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 24-mj-00012-MEH

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.  Michael Karl Geilenfeld,

    Defendant.

---

**GOVERNMENT'S POST-HEARING MEMORANDUM
IN SUPPORT OF MOTION FOR DETENTION AND
IN OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE**

---

The United States of America ("the Government"), by and through Alecia L. Riewerts, Assistant United States Attorney, and Jessica L. Urban and Eduardo Palomo, Trial Attorneys, Child Exploitation and Obscenity Section, U.S. Department of Justice, respectfully submits this memorandum in further support of its motion for detention of defendant Michael Geilenfeld pending trial and in opposition to the Defendant's Motion for Release (Doc. No. 8).  As set forth at the detention hearing held before this Court on January 26, 2024, the Government believes that Geilenfeld is both a danger to another person and the community *as well as* a flight risk, and that detention pending trial is warranted pursuant to 18 U.S.C. § 3142 on both grounds—though, of course, only one ground need be proven in order to warrant detention.  Given the unusual circumstances the Court noted at the detention hearing, as well as the high stakes involved, the Government submits this memorandum to clarify the proffered facts and highlight the rationales for detention.

1

## LEGAL STANDARD

18 U.S.C. § 3142(e)(3)(E) provides a rebuttable presumption that the defendant is a risk of flight and danger to the community where there is probable cause to believe the defendant has committed an offense involving a minor victim under 18 U.S.C. § 2423(b)—*i.e.*, Traveling in Foreign Commerce with the Purpose of Engaging in Illicit Sexual Conduct.  Here, a grand jury has already found probable cause to believe that the Defendant committed this crime and indicted him accordingly, such that the presumption applies.

The burden of production thus shifts to the defendant, who must produce some evidence supporting release.  *United States v. Stricklin*, 932 F.2d 1353, 1354 (10th Cir. 1991).  The burden of proof remains with the Government, however, to show that no condition or combination of conditions would reasonably assure (1) the defendant's presence in later proceedings (by a preponderance of the evidence) or (2) the safety of other persons or the community (by clear and convincing evidence).  *See, e.g.*, *id.* at 1354-55; *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003); § 3142(f).  In making its decision, the Court is to consider the nature and circumstances of the charged offense, the defendant's history and characteristics, the weight of the evidence, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  § 3142(g).

## ARGUMENT

The nature and circumstances of the charged offense, the Defendant's history and characteristics, and the weight of the evidence support pretrial detention.  The Government has presented clear and convincing evidence of the Defendant's danger to another person and the community, and has also shown that he is more likely than not a flight risk.

    **I.**    **The Defendant Is a Danger to Another Person and the Community**

As proffered at the detention hearing[1], approximately 20 different individuals have reported being sexually abused by the Defendant as children. The reported abuse has spanned decades. *See, e.g.*, Tr. of Geilenfeld's Trial Testimony 55:15-24 (July 14, 2015) (Exhibit A) (admitting he was accused of abuse in 1987 and continuing through 2011). There are myriad reasons why a defendant like Geilenfeld may not have been charged earlier—including delayed disclosures by victims and statutes of limitations that were previously in place. The defense's speculation about the extent and conclusions of prior investigations is just that—speculation—and is also a red herring, trying to detract from the proven fact that a grand jury found sufficient evidence this month to charge him with a federal offense, Traveling in Foreign Commerce for the Purpose of Engaging in Illicit Sexual Conduct with a Minor. *See* Indictment (Doc. No. 1).

The vast majority of the sexual abuse occurred at the home(s) where Geilenfeld resided with his child victims (including, notably, the St. Joseph's Home for Boys), but at least two individuals with whom the investigative/prosecution team has spoken disclosed that they were sexually abused in the United States years ago—at a hotel and in the Defendant's residence.[2]

That the instant indictment was only returned this past month does not mean that the Defendant is not a present danger. The victims underlying the present charge—i.e., minors between 2006 and 2010—did not disclose their abuse to U.S. law enforcement until approximately 2019-2020. That is, to the undersigned's knowledge, they were not the subject of

---

[1] The Government is including as an appendix to this memorandum what it believes to be a near-verbatim recitation of the oral proffer it made at the detention hearing, as the Government understands that a transcript of the hearing is not yet available. It is also including as exhibits several documents substantiating the proffered information.

[2] As explained at the hearing, the Government is trying to limit identifiable information about the victims and witnesses at this stage of the proceedings, both to protect victims' privacy consistent with 18 U.S.C. §§ 3509(d) and 3771 and because of the Government's concerns with witness intimidation.

earlier investigations in the United States or of the civil defamation suit that went to trial in 2015. Delayed disclosure of sexual abuse is common. *See, e.g.*, Kamala London et al., *Disclosure of Child Sexual Abuse, What Does the Research Tell Us About the Ways That Children Tell?*, Psychology, Public Policy, and Law, Vol. 11, Issue 1, 194, 198 (2005) ("[N]ondisclosure of sexual abuse (silence) in childhood is very common."); *United States v. Parson*, 84 F.4th 930, 934 (10th Cir. 2023) (affirming sexual abuse conviction where expert testified that "delayed reporting of abuse [is] common. When and how much a child discloses depends on the child's age, shyness, shame/embarrassment, and pressure from the perpetrator or family. This is particularly true when the abuser holds a position of power over the victim. . . . Disclosure is often 'a process.' A child may need multiple interviews before fully disclosing the abuse and disclosure is commonly piecemeal. A child who is punished or not believed upon disclosure is less likely to attempt to disclose again."). Further complicating the investigation of the case were the Covid-19 pandemic, with its concomitant restrictions on travel and other matters, as well as the need to coordinate with officials and private citizens in foreign countries including Haiti. *See, e.g.*, U.S. Dep't of State, Haiti Travel Advisory (reporting that Haiti is under a Do-Not-Travel Advisory and that non-emergency U.S. government personnel are ordered to depart the country given the "security situation and infrastructure challenges").

  Moreover, the victims and witnesses with whom the investigative/prosecution team has spoken have disclosed being threatened and bribed to, at best, maintain their silence and, at worst, recant their reports of abuse. The victims'/witnesses' fears of retaliation are well-founded, considering, among other things, that one of the Defendant's close associates ("Subject 2") stabbed one of the child residents, that the Defendant has continued to place Subject 2 in a position of power over children at his Dominican "mission" and continued to send Subject 2

4

money while the Defendant resided in Colorado, and that U.S. Customs and Border Patrol ("CBP") found the Defendant in possession of 11 hard copies of a photo array of victims/witnesses associated with the abuse allegations when he was turned away from the Dominican border in 2019.  *See, e.g.*, Tr. of Deposition of Geilenfeld 94:4-19 (Sept. 14, 2022) (Exhibit B) (acknowledging that Subject 2 "stabbed" the child, that the child was taken to the hospital, and that he (Geilenfeld) "trust[s] [Subject 2] entirely to run the mission in the DR"); HSI ROI (May 22, 2019) (describing border search and photo array); *see also United States v. Hir*, 517 F.3d 1081, 1089 (9th Cir. 2008) (explaining that the relevant community for dangerousness purposes under § 3142 includes a foreign community).

That the Defendant has continued to send tens of thousands of dollars to individuals in the Dominican Republic and Haiti—including to Subject 2—through at least 2022, notwithstanding his portrayal of himself to Probation and this Court as impoverished, further supports that he is trying to cover up his crimes, his financial resources, and his foreign connections, and that he remains a danger to the victims/witnesses in this case—even more so now that he is aware he has been charged in the United States with a grave offense and is facing an effective life sentence if convicted.  *See* 18 U.S.C. § 2423(b) (providing a sentence of up to 30 years' imprisonment).

## II.     The Defendant Is a Flight Risk

The preponderance of the evidence shows that the Defendant is a flight risk.  The Defendant is facing a thirty-year sentence, *see* 18 U.S.C. § 2423(b), which is effectively a life sentence given his age.  Not only does the Defendant have the motivation and ability to flee, he also has a history of fleeing to another country to avoid criminal charges.

Before being indicted, he spent decades abroad in Haiti (and became fluent in Creole). In 2014, Haitian authorities arrested the Defendant and confiscated the Defendant's passport after receiving complaints that the Defendant sexually abused children. A second arrest warrant issued in 2015. Rather than remain in Haiti to face further proceedings, the Defendant fled to the Dominican Republic in 2015 and has not returned to Haiti since. *See, e.g.*, Mandat D'Amener [Arrest Warrant] No. 394 (Oct. 29, 2015) (Exhibit C) (showing Geilenfeld being sought for rape and sexual assault); Customs & Border Patrol Flight Records (Exhibit D) (showing Geilenfeld's flights out of the Dominican Republic to the United States and back beginning in 2015, whereas his flights for the fourteen years before 2015 had been out of and back into Haiti); Certificat de Greffe (June 2, 2017) with accompanying report (Exhibit E) (stating that Arrest Warrant No. 394 was still in effect in June 2017); *see also* Tr. of Deposition of Geilenfeld 94:20-95:25 (Sept. 14, 2022) (stating that after he surrendered his passport to the Haitian court in connection with his abuse charges there, he got a new passport, took a bus to the Dominican Republic, and flew out of the Dominican Republic rather than trying to fly out of Haiti).[3]

He has stated under oath as recently as September 2022 that he wants to return to the Dominican Republic: "all of my efforts is [sic] everyday to get back to the Dominican Republic because that is my wealth, that is my life, that is my everything." *See* Tr. of Deposition of Geilenfeld 45:15-19 (Sept. 14, 2022).

---

[3] The Government has received a subsequent Certificat de Greffe, dated April 16, 2018, indicating that Arrest Warrant No. 394 was suspended on November 16, 2015. Other documents that the Government has obtained (and which it is in the process of obtaining approval to disclose), however, indicate that Geilenfeld was still subject to a Haitian arrest warrant, and the Government does not believe it has ever received a copy of the referenced "suspension" order among the voluminous set of French-, Creole-, and other-language documents it has received. Moreover, Geilenfeld's travel pattern—as reflected in his flight records and in his statement to this Court that he has not traveled to Haiti since 2015, *see* Def. Mot. For Release & Change of Venue, para. 10 (Doc. No. 8)—reinforce that he was fleeing justice in Haiti.

And he still has ties to individuals in Haiti and the Dominican Republic, including by sending large sums of money to various individuals in both countries as recently as 2022.

The Defendant's "resources and foreign ties create[] considerable uncertainty and opportunities for escape." *United States v. Maxwell*, 527 F. Supp. 3d 659, 662 (S.D.N.Y. 2021). Furthermore, he has no current professional, financial, or social ties to the district of prosecution (S.D. Fla.); while venue is proper there based on his flights from Miami to Haiti, he has no current connections to it, and he even contended in his filing with this Court that he would not be able to appear for trial there because of financial limitations. *See* Def. Mot. For Release & Change of Venue, para. 16 (Doc. No. 8); *see also United States v. Rodriguez,* No. 11-02454, 2011 WL 1467221, at *2 (S.D. Fla. Apr. 18, 2011) (denying release when defendant had insufficient ties to the district of prosecution, S.D. Fla.); *United States v. Rivera*, 90 F. Supp. 2d 1338, 1343 (S.D. Fla. 2000) (same).

Similarly, the Defendant's ties to this district are not as strong as he would have the Court believe. The Defendant is not tethered to this district by stable employment, financial obligations, family ties, or other obligations. Although the Defendant claimed at the detention hearing to be a caretaker for his landlord, a neighbor of the Defendant reached out to the Government after the hearing and stated that, to the neighbor's knowledge, this claim is exaggerated and that the landlord is capable of caring for herself.[4] In any event, the arrangement does not appear to be anything more than an informal agreement in exchange for free lodging. Further, the Defendant does not appear to have family, own real estate, or have substantial assets

---

[4] The Defendant's counsel claimed that the Defendant must provide his infirm landlord and her disabled daughter round-the-clock care. If his landlord is on the verge of total disability, she would likely be unable to serve as a suitable third-party custodian or other check on his conduct. On the other hand, if the Defendant's claims about his landlord are exaggerated, his "employment" with her is likely insufficient to be a genuine tie to the community.

7

in this district or the Southern District of Florida. The Defendant accordingly poses an elevated flight risk.

### III.     Conditions of Release Would Be Insufficient

The Government submits that no conditions of release would be sufficient to mitigate the danger he poses and his risk of flight.  Electronic monitoring is not failproof, as subjects may cut off their monitors and commit crimes or flee before law enforcement can respond.  *See, e.g.*, *United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) ("[E]lectronic monitoring, while valuable in pretrial release cases (especially in allowing early detection of possible flight), cannot be expected to prevent a defendant from committing crimes or deter him from participating in felonious activity within the monitoring radius."); *United States v. Minns*, 863 F. Supp. 360, 364 (N.D. Tex. 1994) ("Electronic monitoring systems and other technological devices can be circumvented and rendered inoperative."); Colorado Police Seek Man Who Cut Off GPS Monitor, Brutally Beat, Strangled Ex-Wife (Feb. 3, 2020), https://www.fox6now.com/news/colorado-police-seek-man-who-cut-off-gps-monitor-brutally-beat-strangled-ex-wife.  While this risk may be minimal in some cases, this is not such a case, considering in particular that Geilenfeld has already demonstrated his ability to flee a country after being the subject of an arrest warrant.  *See supra*.

Moreover, Geilenfeld's ability to raise large amounts of money and transmit that money overseas combines with his extensive network of foreign supporters to create a real risk that he will—again—seek to escape justice.  No reasonable condition of release provides adequate assurance that Geilenfeld will not marshal his resources to flee.  *See generally Maxwell*, 527 F. Supp. 3d 659.

Nor would the Colorado community nor members of the house where he has been residing be an appropriate check on him. Geilenfeld abused and threatened children over decades, including in the residences where he lived with the child victims and where other adults stayed. His community, including his landlord, have financially and verbally supported his foreign "mission," despite the repeated disclosures of abuse. Even if the risk of his sexually abusing another individual at this point in time is substantially less than before, he remains a danger to the victims and potential witnesses who would testify against him, and home detention would not sufficiently guard against communicating with and trying to influence them, directly or through intermediaries. That the Defendant has, most recently, shown a lack of candor and made inconsistent statements to Probation is further evidence that his remaining in the community pretrial is too risky.[5]

## CONCLUSION

For the foregoing reasons and those set forth at the detention hearing, the Government respectfully submits that no conditions of release can reasonably assure the safety of another person and the community, and the Defendant's appearance in this matter, and that pretrial detention is warranted pursuant to 18 U.S.C. § 3142.

Respectfully submitted,

COLE FINEGAN
United States Attorney

s/ *Alecia L. Riewerts*
By: Alecia L. Riewerts
Assistant U.S. Attorney
U.S. Attorney's Office

---

[5] As set forth at the detention hearing, for example, the Defendant's landlord/"verifier" for Probation purposes provided answers inconsistent with the Defendant's statements to Probation. *See* Pretrial Services Report (providing different answers regarding payment of rent and the presence of animals at the residence, and not disclosing that there was another individual living in the home, whose presence only came to light at the detention hearing).

9

1801 California St., Ste. 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax: 303-454-0401
E-mail:  Alecia.Riewerts@usdoj.gov

Jessica L. Urban
Eduardo Palomo
Trial Attorneys
Child Exploitation and Obscenity Section
U.S. Department of Justice
1301 New York Avenue NW
Washington, DC 20005
Telephone:  202-305-1698
E-mail:  Jessica.Urban@usdoj.gov
Email:  Eduardo.Palomo2@usdoj.gov

Attorneys for Government

10

## APPENDIX:  FACTUAL PROFFER

1. For nearly all his adult life, the Defendant has had extensive connections to foreign countries, holding himself out as a missionary while using his position and privilege to sexually abuse young boys and cover up his crimes.  Between the mid-1980's and continuing until roughly 2014, the Defendant, a U.S. citizen, operated multiple orphanages in Haiti, including the St. Joseph's Home for Boys.  The majority of the residents were young boys who endured extreme poverty and came from families who had either abandoned them or could no longer care for them.

2. An investigation by HSI and the FBI has revealed that, between at least November 2006 and December 2010 (i.e., the time period in the indictment), the Defendant traveled to Haiti for the purpose of engaging in illicit sexual conduct, traveling from Miami International Airport to Port-au-Prince Haiti approximately 14 times.

3. During that time period, Geilenfeld engaged in illicit sexual conduct with numerous minor boys who resided at the St. Joseph's Home for Boys.  For example, Victim 1, Victim 2, Victim 3, and Victim 4 ("the Victims")—who are purposedly referenced only generically at this hearing, to protect their privacy consistent with 18 U.S.C. §§ 3509(d) and 3771 and because of concerns with victim intimidation— collectively resided at St. Joseph's Home for Boys between 2006 and 2010.  The Victims were between approximately 9 and 13 years of age, and reported to law enforcement that Geilenfeld sexually assaulted them in numerous ways, including anal penetration, attempted anal penetration, and forcible penetration of their mouth with his penis; that Geilenfeld warned them not to disclose what happened; that Geilenfeld offered money and other benefits if the minors would engage in sexual activity with him; and that Geilenfeld threatened them if they did not do as Geilenfeld instructed.

4.     In addition to the victims contemplated in the indictment's time period, numerous other individuals have reported that they were sexually abused by Geilenfeld, in the 1980s, 1990s, and 2000s.  Law enforcement during this investigation has directly spoken with individuals who were *not* the subject of the civil defamation suit (including but not limited to Victims 1-4), and they provided extensive details about their being sexually abused by Geilenfeld.  Moreover, not all the victims at issue in the civil trial testified at that trial, so the jury there did not have access to the universe of information the Government has and intends to present in this case.

5.     Multiple victims and potential witnesses have reported being threatened and retaliated against after reporting being abused by Geilenfeld or after being suspected by Geilenfeld of not being loyal to him, as well as having received payments from Geilenfeld in order to maintain their silence.

6.     The investigation also revealed that Geilenfeld knowingly surrounded himself with other individuals who were a known and suspected danger to the children.  For example, in at least one instance reported to law enforcement, a person working with Geilenfeld ("Subject 1") offered a victim money in exchange for the victim's silence or denial of abuse. As Geilenfeld admitted under oath in 2022, another close associate ("Subject 2"), whom Geilenfeld classified as his "friend," stabbed one of the children, after which stabbing Geilenfeld continued to defend the associate and keep him around children.  And Geilenfeld admitted under oath in 2022 that he allowed a reported pedophile to stay at the orphanage, despite having been alerted to the fact.

7.     In approximately 2014, Haitian social services shut down the St. Joseph's Home for Boys as a result of child welfare concerns.

8.     Geilenfeld was subsequently arrested and incarcerated in Haiti in connection with abuse allegations there. Haitian authorities released Geilenfeld from confinement in mid-2015.

Though the defense may portray this as a dismissal/acquittal, U.S. law enforcement's investigation has determined that the circumstances surrounding the case's conclusion are unclear, and there is evidence of corruption, including statements made by Geilenfeld and "Subject 1" (regarding Geilenfeld being able to "bribe" people in Haiti, that "Money talk[s]", etc.).  In any event, the victims at issue in that proceeding are not the same as the victims of the 2006-2010 time period alleged in the indictment.

9. In October 2015, Haiti issued a new arrest warrant for Geilenfeld (No. 394), based on new complaints, that he sexually abused other children.  Geilenfeld left Haiti and traveled to the Dominican Republic before Haitian authorities could apprehend him.  In the Dominican Republic, Geilenfeld established a new "mission" (house) to "help with the education of…children" of single mothers; he "lived" in the Dominican Republic until the spring of 2019 when Dominican authorities sent him back to the United States.  The investigation has uncovered no evidence that the arrest warrant was cancelled, despite Geilenfeld's say-so.  And his contention that he has not returned to Haiti since 2015 further supports the conclusion that the arrest warrant remained in effect—given how extensively he had traveled there and spent time there until then.

10. In May 2019, U.S. CBP stopped Geilenfeld after he tried to fly back to the Dominican Republic.  During this stop, the officer found Geilenfeld had approximately 11 hard copies of a 3-page photo array of victims/witnesses involved in the sexual abuse allegations (which the Government believes was to aid in intimidating and/or bribing them).  Also during this stop in 2019, Geilenfeld told the officer that he was being expelled from the Dominican Republic and that his home was in Iowa—both of which are different locations than where he told Probation he was living in 2019 (i.e., in Colorado).

11. In a September 2022 deposition, Geilenfeld stated under oath that his intent is to return to the Dominican Republic: "All of my efforts is everyday to get back to the Dominican Republic because that is my wealth, that is my life, that is my everything."

12. Geilenfeld speaks Creole fluently, and in addition to his extensive ties to Haiti and the Dominican Republic, traveled extensively to other countries before founding the orphanages in Haiti. He also traveled repeatedly to Haiti before and after the time period alleged in the indictment.

13. Geilenfeld does not have any known present ties to the Southern District of Florida. His filing yesterday contended that he would not be able to appear for trial there, for financial reasons. And if released, he would need to travel across the country, exposing him to children, and without adequate supervision—e.g., sitting beside minors on a plane/bus, staying in hotels/motels.

14. Geilenfeld has extensive financial resources. For example, over the course of decades he fundraised throughout the United States to keep open the orphanages, and he received financial assistance from church and other communities and individuals in the United States. From 2020-2022, Geilenfeld transferred tens of thousands of dollars to individuals in the Dominican Republic and Haiti, including numerous payments to "Subject 2" (i.e., the individual who stabbed the child resident); his current landlord, the "verifier" for Probation, was involved in some of these payments. Geilenfeld has also retained private counsel in this case (and had private counsel since 2010). These financial resources were not disclosed to Probation and are inconsistent with his suggestion to Probation that he is impoverished.

15. As for Geilenfeld's life in Colorado, he stated under oath in 2022 that he "live[s] a very hidden existence." This past week he reported his jobs as being a self-employed dogwalker

and lawn mower—positions for which no one supervises him and through which he can easily come into contact with children. These are also positions requiring physical fitness, and there is no indication of any health problems. Perhaps most troubling, the defense said today that he resides in a home with a "child," and the existence of another person in the home was not disclosed to Probation.

16. To the extent the defense suggests Geilenfeld was cooperative during his arrest and questioning on Friday, that is not the whole story: Geilenfeld did not initially know that he had been indicted on a sexual abuse charge, and once Geilenfeld learned what he was charged with, his demeanor changed from amiable to angry, yelling, and what the arresting agent described as passive physical resistance to going with law enforcement.

17. Geilenfeld has repeatedly attempted to portray his accusers as incredible, pointing in particular to their poverty and vulnerability in Haiti as purported motivators for their reports of abuse. But Geilenfeld purposely sought out children who had these characteristics, and the fact is that approximately 20 different individuals have reported being sexually abused by Geilenfeld over the years.

18. This proffer is not the full universe of incriminating facts.

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of January, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

*s/Portia Peter*
Legal Assistant
United States Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
Email: Portia.Peter@usdoj.gov